[Cite as *State v. Brady*, 2019-Ohio-46.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27763 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-392 |
| | : | |
| BRANDON A. BRADY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 11th day of January, 2019.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, P.O. Box 574, Dayton, Ohio 45409
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Brandon Brady appeals from his conviction on four counts of voyeurism, five counts of pandering sexually oriented material involving a minor, and fourteen counts of rape. Brady challenges the trial court's decisions overruling his motions to suppress statements that he made to a police officer and video recordings found on a USB drive. Brady also challenges the 77-year aggregate prison sentence imposed by the trial court as cruel and unusual punishment and challenges the court's consecutive-sentence findings as unsupported by the record.

{¶ 2} We conclude that the trial court did not err by either overruling the suppression motions or imposing the aggregate prison sentence, and we affirm.

### I. Facts and Proceedings

{¶ 3} Around 2:35 a.m. on February 4, 2017, the Huber Heights Police Department received a report that a sexual assault had occurred at a residence on Rosebury Drive in Huber Heights. The report said that a seventeen-year-old victim had been given medication by her father earlier that night that had "knocked her out." The victim awoke to find herself naked in bed with her father engaging in intercourse with her. The incident was reported by the victim's boyfriend.

{¶ 4} Officer Corey Siegrist was the first to respond, arriving around 2:39 a.m. When he drove up to the residence, he saw an individual, later identified as Brady, standing next to the driver's side door of a car parked in the driveway of the same address where the sexual assault was reported. Officer Siegrist watched as Brady got into the car, started the engine, and began to back out. Siegrist pulled up to make contact with Brady and "begin [his] investigation" of the reported sexual assault. (Tr. 13.) Brady

quickly backed his car into the street, directly in front of Siegrist's cruiser. Officer Siegrist turned on the cruiser's overhead lights to initiate a traffic stop for illegal backing.

{¶ 5} Brady immediately stopped, and Officer Siegrist exited his cruiser and approached the driver's side window of Brady's car. Siegrist told Brady why he had stopped him and asked for Brady's identification. Officer Siegrist took Brady's identification back to his cruiser to run a check on his onboard computer. Brady remained in his car. By this time, another police officer, Officer Holbrook, had arrived. Siegrist asked him to watch Brady while Siegrist continued his investigation of the sexual assault report.

{¶ 6} Officer Siegrist knocked on the front door of the house, and a young male answered the door. Siegrist asked for the victim by name, and she appeared around a corner. She was upset and crying. Officer Siegrist noticed that she was "unstable" in her walking. The victim confirmed the allegations in the police report. Officer Siegrist then went back to talk to Brady, who was still sitting in his car.

{¶ 7} Siegrist asked Brady to step out, telling him that he was a suspect in a sexual assault allegation. Officer Siegrist told Brady that the police "were just trying to figure things out, and work through the case." (Tr. 18.) Standing in the street with Brady, Siegrist asked him if there was "anything [he] should know about" inside his car. (*Id.* at 19). Brady said that he had some prescription medication and a loaded handgun, for which he had a valid concealed-carry permit. Officer Siegrist asked Brady if he could search the car, and Brady consented. Officer Kerry Combs, who was also now on the scene, heard Brady consent to the search.

{¶ 8} Officer Siegrist then began searching the car, while Brady stood by with Officer Combs. On the front passenger floorboard, Siegrist found a backpack. He took a

quick look inside and saw several bottles containing medication prescribed to Brady, the handgun, and various other items. Officer Siegrist then learned that the detective assigned to the case, Josh Fosnight, wanted to hold off searching the car until a search warrant was obtained. Siegrist ended his search, and Brady was put in the back seat of Officer Combs's cruiser. Brady was then advised of his *Miranda* rights. Brady refused to allow the police to search his house and refused to speak with the police without an attorney. Brady was allowed to leave the scene around 3:35 a.m., though not in the car that he had been driving when he was first stopped.

{¶ 9} Later that morning, around 6:00 a.m., a search warrant for Brady's home and car was issued. Detective Fosnight searched the backpack that Officer Siegrist had found in the car and found a USB drive next to the bottles of medication. Fosnight was interested in the drive's contents, because he knew that Brady had recorded his sexual activity in the past; Detective Fosnight had investigated a previous report accusing Brady of sexual assault. The previous report was from a friend of Brady's wife, who said that she had visited the Bradys' home. After being served a drink by the couple, the woman began feeling "woozy" and then "blacked out," but she remembered having some sort of sexual encounter with Brady. She also remembered seeing what she believed was a camera mounted on the dresser in Brady's bedroom, where the sexual encounter took place. A search of Brady's home during the investigation turned up videos that Brady had taken of he and his wife engaging in sexual activity.

{¶ 10} Detective Fosnight applied for a second search warrant, this one authorizing a search of the USB drive's contents. In his supporting affidavit, he included a paragraph describing the videos that were found in the investigation of the previous sexual-assault

allegations against Brady. The warrant was issued. On the USB drive, Detective Fosnight found 59 separate video files dated from October 5, 2016, through January 24, 2017. Some videos showed Brady's daughter clothed and sleeping in her bed. Other videos showed her naked in the shower; it appeared that these videos were recorded through a hole in the shower wall. The remaining videos showed Brady sexually assaulting his daughter while she slept. The images were of Brady forcing his fingers and penis into his daughter's mouth and vagina while she was unconscious. The final video showed Brady ejaculating onto her face.

{¶ 11} After Brady was released from the scene, he fled to his mother's home in Tennessee. Brady was arrested there the following day and extradited back to Ohio, where he was soon indicted on four counts of voyeurism, in violation of R.C. 2907.08(C); five counts of pandering sexually oriented material involving a minor, in violation of R.C. 2907.322(A)(1); and fourteen counts of rape (substantially impaired victim), in violation of R.C. 2907.02(A)(1)(a).

{¶ 12} On March 15, 2017, Brady filed a motion to suppress his statements to police and the videos found on the USB drive. After a hearing, the trial court overruled the motion to suppress. The court concluded that Brady was not in custody for *Miranda* purposes when he was detained, that he validly consented to the search of his car, that he was not unlawfully detained, and that both of the search warrants were valid. On May 10, 2017, Brady filed a second motion to suppress the videos under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), arguing that the affidavit supporting the search warrant of the USB drive contained false or misleading information. The trial court also overruled this motion to suppress, concluding that Brady had "not made a

substantial preliminary showing that a false statement, knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit."

{¶ 13} Brady pleaded no contest to all the charges and was found guilty. At his presentence interview, Brady said that he could not figure out why he did those things to his daughter. He claimed that none of the crimes was planned and that, when he committed each act, he was under the influence of alcohol or prescription medication. The trial court sentenced Brady to a total of 77 years in prison.

{¶ 14} Brady appeals.

## II. Analysis

{¶ 15} Brady assigns two errors to the trial court. The first assignment of error challenges the court's decisions overruling the motions to suppress. The second assignment of error challenges the aggregate prison sentence that the court imposed.

### A. The motions to suppress

{¶ 16} The first assignment of error alleges:

THE TRIAL COURT ERRED IN OVERRULING BRADY'S MOTIONS TO

SUPPRESS.

{¶ 17} In reviewing a trial court's motion-to-suppress ruling, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." (Citation omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citation omitted.) *Id.*

{¶ 18} Brady argues that the trial court should have sustained his first motion to

suppress based on a *Miranda* violation and invalid consent to search the car. He argues that the court should have sustained his second motion to suppress based on a *Franks* violation and a lack of probable cause.

1. There was no *Miranda* violation.

**{¶ 19}** "The right to [*Miranda*] warnings is grounded in the Fifth Amendment's prohibition against compelled self-incrimination." *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 16 (2d Dist.), citing *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). "*Miranda* warnings are not required simply because the questioning takes place in a coercive atmosphere." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 26, citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Instead, "[t]he procedural safeguards prescribed by *Miranda* apply only when persons are subjected to 'custodial interrogation.' " *State v. Thomas*, 2d Dist. Montgomery No. 20643, 2005-Ohio-3064, ¶ 27, citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**{¶ 20}** " 'Custodial interrogation' means questioning initiated by the police after the person has been taken into custody or otherwise deprived of his freedom to the degree associated with a formal arrest." (Citations omitted.) *State v. Vineyard*, 2d Dist. Montgomery No. 25854, 2014-Ohio-3846, ¶ 32. In deciding whether a person was in custody, a court "must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave." *Hoffner* at ¶ 27, citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Based on the factual circumstances, "the court must apply an objective test to

resolve 'the ultimate inquiry' of whether there was a ' "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " *Id.*, quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), quoting *Mathiason* at 495. "The subjective views of the interviewing officer and the suspect are immaterial to the determination of whether a custodial interrogation was conducted." (Citations omitted.) *State v. Earnest*, 2d Dist. Montgomery No. 26646, 2015-Ohio-3913, ¶ 22.

{¶ 21} Here, Officer Siegrist approached Brady's car and gathered Brady's information. When Officers Holbrook and Combs arrived, Officer Siegrist went to the house and spoke with the victim, who confirmed the allegations against Brady. While Officer Siegrist spoke with the victim, Brady remained in his car. When Officer Siegrist returned to Brady, Siegrist asked him to exit the car so that he (Siegrist) could explain what was going on. Officer Siegrist then told Brady that he was a suspect in a sexual-assault report, asked Brady if there was anything illegal inside the car, and asked for Brady's consent to search the car. Brady responded that prescription medication and a handgun were in the car. Brady was never handcuffed or otherwise physically restrained. No police officer ever drew his weapon or tried to intimidate him. Brady was never formally arrested, and he was allowed to leave the scene about an hour after he was first stopped.

{¶ 22} These circumstances do not show that Brady was in custody for purposes of *Miranda*. It is true that Brady was detained, but "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 112, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010). "*Miranda* is to be enforced 'only in those types of situations in which the concerns that powered the decision

are implicated.' " *Id.*, quoting *Berkemer v. McCarty*, 468 U.S. 420, 437, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Accordingly, "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." *Id.* at 113, citing *McCarty* at 439-440. These investigatory detentions are "limited in duration and purpose and can only last as long as it takes a police officer to confirm or to dispel his suspicions." *Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, at ¶ 17, citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

{¶ 23} Here, police officers did briefly restrict Brady's movement while they investigated the sexual-assault report. But that does not mean that Brady was in custody for the purposes of *Miranda*. It is true that during an investigatory detention "a reasonable person would have believed that he was not free to leave." *Strozier* at ¶ 17, citing *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The question is whether a reasonable person would have understood the detention to constitute a restraint on freedom of movement of the degree which the law associates with a formal arrest. *Id.*, citing *Yarborough v. Alvarado*, 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). For example, in *Hoffner*, police officers briefly restricted the defendant's movement during the initial stages of a search, in order to secure the location and search the area for weapons and evidence. The Ohio Supreme Court held that, given the circumstances in the case, directing the defendant to stay in a specific location was reasonable. *Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, at ¶ 30. Here, given the allegations in the sexual-assault report, the officers' detention of Brady while they completed their initial investigation was reasonable. We note too that Brady never said that he wanted to leave. *Compare id.* (noting the same about the defendant in that

case). Finally, that the officers allowed Brady to leave after they had completed their initial investigation supports the conclusion that he was not in custody for purposes of *Miranda*.

{¶ 24} As a final matter, we cannot identify any statement that Brady made to Officer Siegrist that might have incriminated him. All Brady said was that he had prescription medication and a handgun in the car. Brady claims that the medication and backpack in which the USB drive was found were obtained as a result of his statements. But even if he had not said anything to Officer Siegrist, the backpack, medication, and USB drive would have been found during the later search conducted under a warrant.

2. Brady's consent to search his car was valid.

{¶ 25} Brady argues that his consent to search the car was invalid. He contends that the consent was given while he was being detained illegally. Brady also contends that Officer Siegrist had no valid reason to ask for consent to search.

{¶ 26} Brady was not being detained illegally. As we have already said, a police officer may temporarily detain a person for investigatory purposes, and the investigatory detention may last as long as it takes to confirm or dispel the officer's suspicions. Here, the trial court found that Brady was detained for both the traffic offense and the report of sexual assault. The report alleged that the perpetrator of the assault was the victim's father. Officer Siegrist arrived at the scene at 2:30 in the morning, shortly after the report was made, and he saw Brady attempting to leave. Officer Siegrist testified that he did not detain Brady based solely on the traffic violation. Siegrist said that he was responding to the residence based on the sexual-assault report and that, when he saw Brady in the driveway, he intended to make contact with him in order to begin the investigation into the report. We think that the traffic violation merely provided an additional objective

justification for the detention, because even without the traffic violation, any reasonable police officer in Siegrist's position would have detained Brady.

**{¶ 27}** Brady's continued detention was reasonable too. The report alleged that the victim's father committed the assault, so Officer Siegrist had good reason to suspect Brady. That justified Brady's detention while Siegrist talked to the victim. Officer Siegrist's actions constituted reasonable means by which to either confirm or dispel the sexual-assault allegation. The victim's confirmation of the allegation reasonably increased Officer Siegrist's suspicion, justifying Brady's continued detention while Siegrist continued the investigation. Given the allegation that Brady had drugged the victim and that Brady appeared to be fleeing the scene when he arrived, it was reasonable for Officer Siegrist to ask Brady what he had with him in the car. In sum, Officer Siegrist was gathering information on the scene and making assessments as new facts became known to him.

**{¶ 28}** Finally, Brady contends that Officer Siegrist had no valid reason to ask for consent to search. He says that the request was made under false pretenses. Even in the context of the sexual-assault investigation, says Brady, there was no indication, nothing in plain view in the car, that would justify a search. But Brady cites no legal authority for the proposition that a police officer must have a valid reason to ask for consent to search a vehicle, and we find none. Regardless, as we just said, under the circumstances, it was reasonable to want to know what Brady was taking with him.

**{¶ 29}** "Consent is an exception to the warrant requirement, and requires the State to show by clear and positive evidence that the consent was freely and voluntarily given." *State v. George,* 2d Dist. Montgomery No. 25945, 2014-Ohio-4853, ¶ 28. Since Brady was lawfully detained at the time Officer Siegrist asked for consent, the standard totality-

of-the-circumstances analysis for voluntariness applies. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222-223, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Officers Siegrist and Combs testified that Brady readily gave consent for a search of his car. At the time he consented, Brady was standing in the street next to the car. He was not in handcuffs, and no officer had threatened him or acted in a coercive or intimidating manner. Brady offered no evidence that his consent was involuntary. The trial court's finding that Brady voluntarily consented to the search of his car was supported by competent, credible evidence.

### 3. The warrant to search the USB drive was valid.

{¶ 30} Brady's last suppression argument challenges the warrant authorizing the search of the USB drive. He first argues that the supporting affidavit contained false or at least misleading information. Brady also argues that a lack of probable cause precluded issuing the warrant.

{¶ 31} Paragraph f of the supporting affidavit stated:

In a prior investigation of Brandon Brady regarding an alleged rape revealed the possibility of the suspect recording his victim after slipping something in her drink. She alleged to having been drugged and not remembering much. A search warrant was executed then and a number of computers, disks and tapes were seized and searched, finding he did record sexual activity, though at the time, the only activity was with his wife, Tara Brady. The USB in this incident was taken as it was alongside the medications presumed to have been given to his daughter and due to the fact that he is known to digitally record his sexual activity.

Brady points out that there was no indication that the alleged sexual assault in this case had been recorded. He also points out that, in the previous rape investigation, he was never charged, and the only recordings discovered were legal and involved only his wife. Paragraph f, says Brady, was included in the affidavit to mislead.

{¶ 32} The U.S. Supreme Court held in *Franks* that, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155-156, 98 S.Ct. 2674, 57 L.Ed.2d 667. A supporting affidavit is presumed valid. *Id.* at 171. An attack "must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Id*. Rather, "[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id*.

{¶ 33} We agree with the trial court's conclusion that Brady did not make the required preliminary showing with respect to paragraph f. The court found no evidence in the record suggesting that paragraph f contained any false statement. Detective Fosnight testified that he sought a search warrant for the contents of the USB drive because it was found inside the backpack that Brady was carrying in his car, because it was found near prescription sleeping pills, and because Fosnight had helped investigate a prior allegation of sexual assault against Brady in which the victim alleged that he had recorded the sexual encounter. Detective Fosnight also said that the earlier investigation yielded evidence that Brady had recorded his sexual activity. We note too that paragraph f

specifically says that the only sexual activity previously discovered was a recording of Brady with his wife, not with the alleged victim in the prior investigation.

{¶ 34} Brady also argues that there was no probable cause to justify a search of the USB drive. He points out that there was no allegation prior to the search that he had recorded any sexual encounter with his daughter. Brady says that the only reason to think that he may have recorded an encounter was that, in the previous, unrelated investigation of a rape allegation, police discovered that he had lawfully recorded sexual encounters with his wife.

{¶ 35} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution provide that search warrants may be issued only upon probable cause. *State v. Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, 37 N.E.3d 123, ¶ 11-12. "The Supreme Court of the United States has provided that in determining whether a search warrant was issued upon a proper showing of probable cause, reviewing courts must examine the totality of the circumstances." *Id.* at ¶ 13, citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for * * * conclud[ing]' that probable cause existed." *Gates* at 238-239, quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), *overruled on other grounds*, *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). "[T]he issuing magistrate's duty is to determine whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Jones* at ¶ 13, quoting *Gates* at 238. "The duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an

affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph two of the syllabus.

{¶ 36} Here, Detective Fosnight reasonably inferred that Brady might have recorded himself sexually assaulting his daughter and that those recordings might be on the USB drive. Fosnight knew that the victim in the previous case had alleged that Brady video-recorded a sexual assault, and the allegations in that case were similar to the allegations in this case. Although Detective Fosnight could not verify that Brady had recorded the sexual assault alleged in the previous case, Fosnight did discover that Brady had recorded his sexual activity. In this case, Brady was carrying the USB drive in the backpack that he was taking with him at 2:30 in the morning. The drive was found next to a bottle of sleep medication. The victim had said that Brady gave her medication to help her sleep, and it was while she was sleeping that Brady was alleged to have assaulted her.

{¶ 37} The trial court here had a duty to examine the totality of the circumstances to determine whether probable cause existed for issuing the search warrant for the USB drive. Our duty is the same. *See Jones* at ¶ 15 ("[b]oth the trial court and the appellate court had a duty to examine the totality of the circumstances in determining whether probable cause existed for issuing the search warrant"). The trial court found that the warrant was based on probable cause. We agree. After reviewing the supporting affidavit, we think that it was sufficient to give the issuing judge a substantial basis to conclude that there was a fair probability that a search of the USB drive would lead to the discovery of

evidence that Brady had sexually assaulted his daughter.

{¶ 38} The trial court properly overruled both of Brady's motions to suppress. The first assignment of error is overruled.

## B. The aggregate prison sentence

{¶ 39} The second assignment of error alleges:

BRADY'S 77 YEAR CONSECUTIVE PRISON SENTENCE WAS CRUEL AND UNUSUAL PUNISHMENT AND WAS NOT SUPPORTED BY THE RECORD.

{¶ 40} Brady contends that the aggregate prison sentence imposed by the trial court violates the Eighth Amendment prohibition against cruel and unusual punishment. He also contends that consecutive prison terms were not supported by the record.

{¶ 41} Under the sentence-review standard set forth in R.C. 2953.08(G)(2), "we may vacate or modify a sentence only if we find, by clear and convincing evidence, that the sentence is contrary to law or that the record does not support the trial court's findings under certain statutes (including the findings required for consecutive sentences)." *State v. Beverly*, 2016-Ohio-8078, 75 N.E.3d 847, ¶ 9 (2d Dist.), citing *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 22.

1. The aggregate prison sentence was not a cruel and unusual punishment.

{¶ 42} The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment and imposes a requirement of proportionality. *State v. Broom*, 146 Ohio St.3d 60, 2016-Ohio-1028, 51 N.E.3d 620, ¶ 36, citing *Miller v. Alabama*, 567 U.S. 460, 469, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). " '[A]s a general rule, a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment.' " *State v.*

*Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, ¶ 21, quoting *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69, 203 N.E.2d 334 (1964). "[W]e are bound to give substantial deference to the General Assembly, which has established a specific range of punishment for every offense and authorized consecutive sentences for multiple offenses." (Citation omitted.) *Id.* at ¶ 24.

{¶ 43} Brady does not dispute that each of his individual sentences was authorized by statute. He also does not challenge the constitutionality of the sentencing statute or contend that any of his individual sentences was grossly disproportionate to the specific offenses for which the sentence was imposed. Rather, Brady's argument regards his sentence as a whole, as a package.

{¶ 44} Ohio rejects the sentencing-package doctrine. *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, 846 N.E.2d 824, ¶ 10. "[A]ppellate courts may not utilize the doctrine when reviewing a sentence or sentences." *Id.* at paragraph two of the syllabus. Rather, "[a]n appellate court may modify, remand, or vacate only a sentence for an offense that is appealed by the defendant and may not modify, remand, or vacate the entire multiple-offense sentence based upon an appealed error in the sentence for a single offense." *Id.* at paragraph three of the syllabus. "Where none of the individual sentences imposed on an offender are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment." *Hairston* at syllabus.

{¶ 45} Given that each of Brady's individual prison sentences was within the authorized statutory range, we conclude that the total sentence did not constitute cruel and unusual punishment.

## 2. Consecutive sentences are supported by the record.

{¶ 46} The trial court imposed an 11-year prison term for each of the fourteen rape counts as well as shorter prison terms for the other counts. The court ordered Brady to serve seven of the prison terms imposed for rape consecutively, for a total of 77 years in prison. Brady argues that the record did not support sending him to prison for the rest of his life and did not clearly and convincingly support the trial court's consecutive-sentence findings. We disagree.

{¶ 47} The law raises a presumption in favor of concurrent sentences. R.C. 2929.41(A) (absent specific exceptions, "a prison term * * * shall be served concurrently with any other prison term"). A court may order consecutive sentences only if it makes certain findings. The court must find that "the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." R.C. 2929.14(C)(4). And the court must make one other finding, one of which is that "[a]t least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct," R.C. 2929.14(C)(4)(b).

{¶ 48} The trial court here made the mandatory consecutive-sentence findings in the termination entry. The transcript of the sentencing hearing shows that the judge very consciously imposed a life sentence on Brady: "[T]he question really before this Court, at the end of the day, is is there going to be—is this a life sentence or not? It really comes

down to that." (Tr. 118.) The judge said that he struggled with that question. In the end, the judge concluded that Brady's crimes demanded life in prison: "Why in God's name would you want to watch yourself raping your daughter? And I can't get past that. No matter what you say, [defense counsel], I can't get past it. I can't get past the conduct." (*Id.* at 120.) "To me," continued the judge, "the conduct is so far outside societal []norms, and I've represented abnormal societal conduct. But this is so far removed to me that I can't, I just can't, get past it." (*Id.*.) The judge told Brady that he was going to make sure that Brady would spend the rest of his life in prison: "* * * I'm going to make sure from the sentence that I'm about to impose that you will not see the light of day outside of prison. That's the way I feel about it." (*Id.* at 121.)

{¶ 49} Upon review, we do not think that the record clearly and convincingly fails to support the trial court's consecutive-sentence findings. The presentence investigation report describes how, on the night police were called, Brady had given his daughter sleeping pills and she awoke later to find him raping her. That was not the first time he had done this. The videos found on the USB drive prove that Brady had drugged and raped his daughter multiple times between October 2016 and January 2017. He had even drilled a hole in the shower wall through which he recorded her showering. While Brady's aggregate prison term is harsh, we have no basis to conclude that the consecutive sentences were clearly and convincingly unsupported by the record.

{¶ 50} In sum, neither Brady's individual sentences nor his aggregate sentence was contrary to law, as each individual sentence was within the authorized statutory range. The trial court's imposition of consecutive sentences was not contrary to law, as the court made the mandatory consecutive-sentence findings. Finally, the record does

not clearly and convincingly fail to support the trial court's consecutive-sentence findings.

{¶ 51} The second assignment of error is overruled.

### III. Conclusion

{¶ 52} We have overruled both assignments of error presented. The trial court's judgment is affirmed.

. . . . . . . . . . . .

FROELICH, J., concurring:

{¶ 53} Brady was facing a maximum sentence of 198 years, and it is clear from the transcript that the court carefully and seriously weighed the statutory sentencing factors, the statements of Brady's relatives and friends, and the statement of the victim before reaching its decision.

{¶ 54} *Hairston,* 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, a non-homicide case in which the defendant received a 134-year sentence, holds that when "none of the individual sentences are grossly disproportionate to their respective offenses, an aggregate term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment." As such, the sentence in this case was not unconstitutional.

{¶ 55} I write only to comment that sentencing is more than mathematics and that at some point, with specific facts and circumstances (again, not this case), the whole sentence will be constitutionally greater than the sum of its parts.

DONOVAN, J., concurring:

{¶ 56} I concur in Judge Hall's opinion and in Judge Froelich's concurring opinion.

Copies sent to:

Mathias H. Heck
Michael J. Scarpelli
Lucas W. Wilder
Hon. Richard Skelton