[Cite as *State v. Stokes*, 2021-Ohio-3616.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case Nos. 2020-CA-57 & |
| | : | 2021-CA-18 |
| v. | : | |
| | : | Trial Court Case Nos. 2019-CR-667 & |
| EVERETT W. STOKES, JR. | : | 2020-CR-319 |
| | : | |
| Defendant-Appellant | : | (Criminal Appeal from |
| | : | Common Pleas Court) |

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of October, 2021.

. . . . . . . . . . .

IAN A. RICHARDSON, Atty. Reg. No. 0100124, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
  Attorney for Plaintiff-Appellee

STEVEN H. ECKSTEIN, Atty. Reg. No. 0037253, 1208 Bramble Avenue, Washington Court House, Ohio 43160
  Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** Defendant-appellant Everett W. Stokes, Jr., appeals his convictions for the following offenses: in Clark C.P. No. 2020-CR-319, aggravated robbery, with firearm and repeat violent offender (RVO) specifications; and in Clark C.P. No. 2019-CR-667, two counts of robbery, one count of aggravated robbery with firearm and RVO specifications, and one count of having weapons while under disability.   Stokes filed a timely notice of appeal on October 26, 2020.

**{¶ 2}** The evidence adduced at trial established that on September 22, 2019, an individual later identified as Stokes entered a Speedway gas station located at 405 South Burnett Road in Springfield, Ohio.   The cashier in the store that day, Tim Bowman, testified that Stokes immediately walked behind the sales counter, indicated that he had a firearm, and ordered Bowman to open the cash register and give Stokes the money inside.   Stokes was wearing a gray zip-up hooded jacket, black sweatpants, blue shorts with white stripes on the sides under the sweatpants, a black mask, and a pair of white tennis shoes.   These clothing items were found by police near the store the next day.

**{¶ 3}** Bowman testified that although Stokes was wearing a mask, Bowman "got a good look at his eyes." Tr. 95.   Bowman also testified that he did not observe a firearm, but Stokes pressed a hard pointy object into Bowman's back and threatened to shoot him if he did not comply.   Bowman opened the cash register, and Stokes took the money from the drawer.   Bowman testified that before leaving the store, Stokes punched him in the nose, then Stokes fled the scene.

**{¶ 4}** On October 2, 2019, Stokes entered another Speedway located at 1314 East Main Street in Springfield, Ohio, and told the cashier, Michael Wagner, "it's a robbery, give me the money." Tr. 128.   Wagner testified that Stokes was wearing a white face

covering, a brown coat, black pants, and black shoes. Wagner testified that the white face covering worn by Stokes resembled the cut-off sleeve of a t-shirt. Wagner testified that he gave Stokes all of the money in the cash register, and Stokes then fled on foot. During the robbery, Wagner was able to push the security button under the counter in the store, thereby alerting the police that a robbery was in progress. The police arrived shortly after Stokes left the store. Wagner testified that Stokes did not threaten him with any type of weapon during the robbery. Upon arriving at the scene, Springfield Police Officer Corey Schmidt searched the surrounding area and found a white face covering, a brown coat, black pants, a black shoe, and a sweatshirt that had been discarded in the street.

{¶ 5} One day later on October 3, 2019, Stokes again entered the Speedway located at 405 South Burnett Road in Springfield. The cashier that day, Alvin Donovan, testified that Stokes ran behind the counter with a firearm and ordered Donovan to open the cash register or Stokes would "kill him." Tr. 160. Donovan testified that Stokes was wearing a mask and a gray Old Navy brand sweatshirt. On cross-examination, Donovan testified that Stokes did not threaten him but only told him to open the cash drawer. Donovan testified that Stokes pressed the barrel of a firearm into his back during the robbery. Donovan testified that he knew Stokes was using a firearm because he observed the gun's handle before it was pressed into his back. Donovan also testified that he had military experience and that he knew how it felt to have a gun pressed to his back. After opening the cash drawer for Stokes, Donovan pressed the security button under the counter. Donovan testified that, at that point, Stokes removed approximately $100 from the cash register, and he immediately fled from the store on foot traveling

northbound.

{¶ 6} Springfield Police Officer Greg Ivory testified that he and his partner Officer Amber Hayslip were tasked with the initial investigation of the robbery of the Speedway that occurred on October 3, 2019. Officer Ivory testified that, after speaking with Donovan and learning that the suspect fled on foot going northbound, he believed that the suspect might have been running toward the Cole Manor Apartments, which were in that direction. Additionally, Officer Ivory testified that he had information that Stokes was a suspect in the September 22, 2019 robbery and that he lived at Cole Manor in apartment number 812.

{¶ 7} Springfield Police Detective Ronald W. Jordan testified that, while investigating the Speedway robbery that occurred on September 22, 2019, he was able to view a surveillance video from the Cole Manor Apartments that depicted an individual carrying a duffel bag leaving and then returning to the premises during the same time frame in which the actual robbery occurred. The individual was wearing blue shorts, a black ball cap, and a white t-shirt. Detective Jordan spoke with residents of Cole Manor, who identified the individual from the surveillance video as Stokes and said that he resided in apartment 812. Detective Jordan testified that the surveillance video from Cole Manor showed the individual identified as Stokes leave the apartment complex just before 11:00 p.m. on the night of September 22, 2019 and then return to his apartment 10 to 12 minutes later wearing the same clothes but also with a "white collar" around his neck. Based upon the information gathered by Detective Jordan, Officers Ivory and Hayslip then went to Cole Manor apartment 812, where they spoke with a female who stated that Stokes was not present.

{¶ 8} Officer Ivory testified that, after stopping at Stokes's apartment, he and Officer Hayslip went to an alley north of the Speedway on South Burnett Road and south of Cole Manor. In the alley, they located a pair of white tennis shoes, a gray Old Navy zip-up sweatshirt, and a small amount of cash. After collecting what they believed to be evidence from the robbery, Officers Ivory and Hayslip returned to Cole Manor apartment 812; they were able to apprehend Stokes upon finding that he had returned to the apartment. Stokes was placed under arrest and taken to jail. Significantly, Detective Jordan testified that the shorts Stokes was wearing in the Cole Manor surveillance video appeared to be the same type and color as the shorts that he was wearing under black sweatpants when he robbed the Speedway on September 22, 2019, and when he was arrested on October 3, 2019. The officers were unable to retrieve a firearm during their investigation.

{¶ 9} On October 15, 2019, Detective Dana Lewis met with Bowman, the Speedway cashier from the September 22 robbery, and showed him a six-person photo array line-up to see if he could identify the individual who robbed the store that night. After being shown the photo array, Bowman informed Detective Lewis that he could not definitively identify anyone in the array as the perpetrator of the robbery. However, Detective Lewis testified that Bowman stated that, although he could not be sure, the individual in the fifth frame of the photo array most closely resembled the perpetrator; the individual in the fifth frame of the photo array was Stokes.

{¶ 10} Also on October 15, 2019, Stokes was indicted in Case No. 2019-CR-667 for one count of robbery in violation of R.C. 2911.02(A)(2), a felony of the second degree (Count II); two counts of robbery in violation of R.C. 2911.02(A)(3), felonies of the third

degree (Counts I and III); one count of aggravated robbery, with firearm and RVO specifications, in violation of R.C. 2911.01(A)(1), a felony of the first degree (Count IV); and one count of having weapons while under disability in violation of R.C. 2923.13(A)(2), a felony of the third degree (Count V).

{¶ 11} On February 13, 2020, Stokes filed a motion for independent expert analysis in which he requested that certain evidence collected by the police be tested by forensic DNA experts. On February 18, 2020, the trial court granted the motion. On March 10, 2020, Stokes filed a motion to suppress a video-taped statement he made to Detective Jordan on October 16, 2019; on March 19, 2020, the trial court sustained in part and overruled in part Stokes's motion to suppress.

{¶ 12} On June 16, 2020, Stokes was indicted in Case No. 2020-CR-319 for one count of aggravated robbery with firearm and RVO specifications, in violation of R.C. 2911.01(A)(1), a felony of the first degree. Case No. 2020-CR-319 related to the offense that was committed at the Speedway on September 22, 2019. The indictments in Case Nos. 2019-CR-667 and 2020-CR-319 were joined for the purpose of trial. Prior to trial, the State dismissed one count of robbery (felony of the third degree) in Case No. 2019-CR-667.

{¶ 13} A two-day jury trial was held on October 13 and 14, 2020. Stokes was found guilty on all remaining counts in the indictments. At disposition, the trial court merged one of the counts of robbery in Case No. 2019-CR-667 (Count II) with the count of aggravated robbery in Case No. 2020-CR-319 for the purposes of sentencing; the State elected to proceed to sentencing on the aggravated robbery in Case No. 2020-CR-319.

{¶ 14} The trial court sentenced Stokes as follows. In Case No. 2019-CR-667:

Count III, robbery, 3 years in prison; Count IV, aggravated robbery, 11 years; Count V, having weapons while under disability, 3 years; and 3 years each on the firearm and RVO specifications contained in Count IV.   In Case No. 2020-CR-319, for aggravated robbery with firearm and RVO specifications, the trial court sentenced Stokes to 11 years in prison and to 3 years on each of the specifications.   The trial court ordered that all of the sentences be served consecutively for an aggregate sentence of 40 years to 45 and one-half years in prison.

{¶ 15} Stokes now appeals from his convictions.

{¶ 16} Because they are interrelated, Stokes first three assignments of error will be discussed together as follows:

THE TRIAL COURT ERRED IN DENYING DEFENDANT-APPELLANT'S CRIM.R. 29 MOTION FOR ACQUITTAL AS THE EVIDENCE PRESENTED WAS INSUFFICIENT TO CONCLUDE THAT GUILT HAD BEEN PROVEN BEYOND A REASONABLE DOUBT IN VIOLATION OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

THE TRIAL COURT ERRED IN ACCEPTING THE JURY VERDICT OF GUILTY AS THE EVIDENCE PRESENTED WAS INSUFFICIENT TO CONCLUDE THAT GUILT HAD BEEN PROVEN BEYOND A REASONABLE DOUBT IN VIOLATION OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND

FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

THE TRIAL COURT ERRED IN ENTERING A FINDING OF GUILTY BECAUSE SUCH VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. FIFTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

{¶ 17} In his first and second assignments, Stokes contends that the trial court erred when it overruled his Crim.R. 29 motion for acquittal because the evidence adduced by the State at trial was insufficient to establish that he was the individual who robbed the two Speedway stores. Additionally, Stokes argues that the evidence was insufficient to establish that he used a firearm in the commission of the robberies at the Speedway store at 405 South Burnett Road on September 22, 2019, and October 3, 2019. Stokes also argues that the evidence was insufficient to establish his status as a repeat violent offender. Finally, Stokes argues that his convictions were against the manifest weight of the evidence.

{¶ 18} Crim.R. 29(A) states that a court shall order an entry of judgment of acquittal if the evidence is insufficient to sustain a conviction for the charged offense. "Reviewing the denial of a Crim.R. 29 motion therefore requires an appellate court to use the same standard as is used to review a sufficiency of the evidence claim." *State v. Witcher*, 6th Dist. Lucas No. L-06-1039, 2007-Ohio-3960. "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (Citations omitted.) *State v. Crowley*, 2d Dist. Clark No. 2007-CA-99, 2008-Ohio-4636, ¶ 12.

{¶ 19} "A challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 69. "A claim that a jury verdict is against the manifest weight of the evidence involves a different test. 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " (Citations omitted.) *Id.* at ¶ 71.

{¶ 20} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 21} This court will not substitute its judgment for that of the trier of fact on the

issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510, *4 (Oct. 24, 1997).

### I. Identification of Stokes

### Robbery on September 22, 2019

{¶ 22} Stokes argues that Speedway cashier Bowman's testimony that he recognized Stokes by his eyes was insufficient to properly identify him as the perpetrator of the aggravated robbery on September 22, 2019. Stokes also argues that the evidence was insufficient to establish that he used a firearm during the robbery and that the DNA tests performed on the clothes he wore during the robbery were inconclusive because DNA from several other individuals was also present on the clothes.

{¶ 23} In *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, the Ohio Supreme Court stated:

> Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. This truism is reflected in the state's constitutional burden to prove the guilt of "the accused" beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Like any fact, the state can prove the identity of the accused by "circumstantial or direct" evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991). The relevant question in a sufficiency-of-the-evidence review is whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable

doubt." *Id.* at paragraph two of the syllabus, following *Jackson v. Virginia*,

443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*Id.* at ¶ 15.

{¶ 24} As previously stated, Bowman testified that during the robbery on September 22, 2019, he "got a good look at his [the perpetrator's] eyes." Bowman also testified as follows: "I could tell you that the ones [photographs] they showed on the media, they put it on the news, and I could see his eyes, yes, it looked like him. As I'm sitting here now, standing here looking at him now, yes, that is man that did it." Tr. 100.

{¶ 25} Furthermore, Detective Lewis met with Bowman and showed him a six-person photo array line-up to see if he could identify the individual who robbed the store that night. After being shown the photo array, Bowman informed Detective Lewis that he could not definitively identify anyone in the array as the perpetrator of the robbery. However, Detective Lewis testified that Bowman stated that, although he could not be sure, the individual in the fifth frame of the photo array most closely resembled the perpetrator. As previously stated, the individual in the fifth frame was Stokes.

{¶ 26} Detective Jordan testified that, while investigating the Speedway robbery that occurred on September 22, 2019, he viewed a surveillance video from Cole Manor Apartments that depicted an individual, later identified as Stokes, carrying a duffel bag; the individual left and then returned to the premises during the same 10- to 12-minute time frame in which the robbery occurred. Stokes was wearing blue shorts, a black ball cap, and a white t-shirt and returned wearing the same clothes. Detective Jordan also testified that the shorts Stokes was wearing in the Cole Manor surveillance video appeared to be the same type and color of the shorts that Stokes was wearing when he

was arrested on October 3, 2019.

**{¶ 27}** As previously stated, during the robbery on September 22, 2019, Stokes was wearing a gray zip-up hooded jacket, black sweatpants, blue shorts with white stripes on the sides under the sweatpants, a black mask, and a pair of white tennis shoes. These clothing items were found by police near the store the next day. Timothy Augsback, a forensic scientist at the Ohio Bureau of Criminal Investigation (BCI) testified that he analyzed two of the items taken from the crime scene for DNA, namely, one of the white tennis shoes (State's Exhibit 7), and the small black mask (State's Exhibit 6). Augsback testified that the DNA obtained from those articles of clothing was compared to Stokes's DNA from a buccal swab taken by Detective Jordan. Augsback testified that, with respect to the white tennis shoe, he could not make any comparisons because of the large number of contributors of DNA. However, Augsback testified that after analyzing the black mask, he found that, although small amounts of DNA from other unidentified people were present, Stokes was a "major contributor" of DNA found on the mask, making it likely that he had worn the mask recently. From all of the evidence presented, a reasonable jury could have found beyond a reasonable doubt that Stokes was the individual who committed the aggravated robbery of the Speedway store on September 22, 2019.

### October 2, 2019

**{¶ 28}** As previously stated, on October 2, 2019, Stokes entered another Speedway at 1314 East Main Street in Springfield and told the cashier, Wagner, "it's a robbery, give me the money." Tr. 128. Wagner testified that Stokes was wearing a white face covering, a brown coat, black pants, and black shoes. Wagner testified that the

white face covering worn by Stokes resembled the cut-off sleeve of a t-shirt. After the robbery was over and Stokes had fled the scene, Officer Schmidt searched the surrounding area and found a white face mask, a brown coat, black pants, a black shoe, and a sweatshirt that had been discarded in the street.

{¶ 29} BCI forensic scientist Nicole Hall testified that she analyzed two of the items taken from the crime scene for DNA, namely the white mask (State's Exhibit 15) and the sweatshirt (State's Exhibit 14). Hall testified that, with respect to the white mask, she could not make any comparisons because of the large number of contributors of DNA. Regarding the sweatshirt, however, Hall testified that she tested the front of the collar of the sweatshirt and found that Stokes was a major contributor of DNA on the item. We note that Hall also tested the right cuff of the sweatshirt and found that an unknown male, not Stokes, was also a major contributor of DNA. The DNA sample from the unknown male was entered into the Combined DNA Indexing System (CODIS) database, and the search revealed that the individual's name was Clarence Williams. At trial, Stokes testified that Williams was his friend to whom he lent clothes on a regular basis. Stokes's defense at trial was that he did not commit any of the robberies because he was at his apartment at all times when the robberies occurred. Furthermore, defense counsel suggested at trial that, because Williams's DNA was found on the sweatshirt, then it was him, not Stokes, who committed the robbery on October 2, 2019. Nevertheless, the discovery of Stokes's DNA on the sweatshirt found outside of the Speedway with the other discarded clothing supported the conclusion that he committed the robbery. Viewing the evidence in the light most favorable to the State, we find sufficient evidence to support the jury's conclusion in this regard.

**October 3, 2019**

{¶ 30} On October 3, 2019, Stokes again entered the Speedway at 405 Burnett Road in Springfield.   The cashier that day, Donovan, testified that Stokes ran behind the counter with a firearm and ordered Donovan to open the cash register or Stokes would "kill him." Tr. 160.   Donovan testified that Stokes was wearing a mask and a gray Old Navy brand sweatshirt.   Officer Ivory testified that he and Officer Hayslip found a pair of white tennis shoes, a white mask, a gray Old Navy zip-up sweatshirt, and a small amount of cash in an alley north of the Speedway on South Burnett Road and south of Cole Manor.

{¶ 31} BCI forensic scientist Logan Schepeler testified that she analyzed two of the items taken from the crime scene for DNA, namely the white mask (State's Exhibit 37) and the Old Navy sweatshirt (State's Exhibit 35).   Schepeler testified that with respect to the white mask, he could not make any comparisons because of the large number of contributors of DNA.   Regarding the Old Navy sweatshirt, however, Schepeler testified that he tested each of the cuffs of the sweatshirt and found that Stokes and an unknown female were major contributors of DNA on the item.   Accordingly, the discovery of Stokes's DNA on the Old Navy sweatshirt found outside of the Speedway with the other discarded clothing supported the conclusion that he committed the robbery on October 3, 2019.   Additionally, in all three robberies, Stokes's modus operandi appeared to follow the same pattern, namely: 1) dress in specific clothes to commit the robbery; 2) discard the clothes worn during the robbery nearby; 3) flee the scene and return to his apartment at Cole Manor.   It is noteworthy that Detective Jordan testified that he observed Stokes in the Cole Manor surveillance video carrying a duffel bag as he left his apartment during

the time frame when the September 22, 2019, robbery occurred, as the bag could have contained the clothes he wore during the robbery.   Viewing the evidence in the light most favorable to the State, there was sufficient evidence to support the jury's conclusion in this regard.

## II. Firearm Specifications

{¶ 32} Stokes also contends that the evidence was insufficient to establish that he brandished a firearm during the robberies that occurred on September 22 and October 3, 2019.   As previously stated, Bowman testified that during the September 22, 2019 robbery, Stokes immediately walked behind the sales counter, indicated that he had a firearm, and ordered Bowman to open the cash register and give Stokes the money inside.   Bowman also testified that although he did not observe a firearm, Stokes pressed a hard pointy object into Bowman's back and threatened to shoot him if he did not comply.

{¶ 33} Donovan testified that during the robbery that occurred on October 3, 2019, Stokes ran behind the counter with a firearm and ordered Donovan to open the cash register or Stokes would "kill him." Tr. 160.   Donovan testified that Stokes pressed the barrel of a firearm into his back during the robbery.   Donovan testified that he knew Stokes was using a firearm because he observed the gun's handle before it was pressed into his back.   Donovan also testified that he had military experience and that he knew how it felt to have a gun pressed to his back.

{¶ 34} A "firearm" is "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant" and it "includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." R.C. 2923.11(B)(1).   Thus, in support of a firearm specification, the State

" ' "must prove beyond a reasonable doubt that the firearm was operable or could readily have been rendered operable at the time of the offense." ' " *State v. Staten*, 10th Dist. Franklin No. 18AP-48, 2018-Ohio-4681, ¶ 11, quoting *State v. Murphy*, 49 Ohio St.3d 206, 208, 551 N.E.2d 932 (1990), quoting *State v. Gaines*, 46 Ohio St.3d 65, 545 N.E.2d 68 (1989), syllabus.

**{¶ 35}** A three-year firearm specification requires proof "that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A); *see also* R.C. 2929.14(B)(1)(a)(ii).   Here, the testimony of Bowman and Donovan as well as the videos of the robberies supported a finding that Stokes had a firearm on his person or under his control while inside the Speedway store on September 29, 2019, and October 3, 2019.

**{¶ 36}** Bowman's and Donovan's testimony, if believed, provided sufficient evidence from which the jury could have rationally concluded that Stokes had a firearm in his possession at the time of the offenses.    Proof of a firearm specification beyond a reasonable doubt also requires proof of operability, but circumstantial evidence can support a finding that a firearm was operable, including explicit or implicit threats made by the person in control of the firearm. *See State v. Leftwich*, 2d Dist. Montgomery No. 23383, 2009-Ohio-5044, ¶ 18; *State v. Thomas*, 2d Dist. Montgomery No. 19435, 2003-Ohio-5746, ¶ 46.   We have repeatedly held that both a weapon's existence and its operability may be inferred from the facts and circumstances surrounding an offense. *See State v. Jeffers*, 143 Ohio App.3d 91, 94-95, 757 N.E.2d 417(2d Dist.2001); *State v.*

*Greathouse*, 2d Dist. Montgomery No. 21536, 2007-Ohio-2136, ¶ 19; *State v. Knight*, 2d Dist. Greene No. 2003-CA-14, 2004-Ohio-1941, ¶ 19.   A victim's belief that a defendant had a gun, together with the intent on the part of the defendant to create and use that belief for his own criminal purposes, is sufficient to prove a firearm specification. *Greathouse* at ¶ 23.   In the instant case, Stokes's threat to shoot Bowman and his pointing the barrel of the firearm into his back from inside his pocket formed a sufficient basis from which the jury could have reasonably concluded that the gun was operable. Additionally, Stokes's threat to kill Donovan and the act of pointing the barrel of the firearm into his back was sufficient to establish operability.   Donovan also testified that he saw part of the gun during the robbery.

### III. RVO Specifications

{¶ 37}   R.C. 2929.01(CC) states as follows:

(CC) "Repeat violent offender" means a person about whom both of the following apply:

(1) The person is being sentenced for committing or for complicity in committing any of the following:

(a) Aggravated murder, murder, any felony of the first or second degree that is an offense of violence, or an attempt to commit any of these offenses if the attempt is a felony of the first or second degree;

(b) An offense under an existing or former law of this state, another state, or the United States that is or was substantially equivalent to an offense described in division (CC)(1)(a) of this section.

(2) The person previously was convicted of or pleaded guilty to an offense

described in division (CC)(1)(a) or (b) of this section.

{¶ 38} Additionally, R.C. 2929.14(B)(2)(b) provides that to impose an additional penalty in the form of a prison sentence upon a repeat violent offender of one to ten years, the court must find:

(i) The offender is convicted of or pleads guilty to a specification of the type described in section 2941.149 of the Revised Code that the offender is a repeat violent offender.

(ii) The offender within the preceding twenty years has been convicted of or pleaded guilty to three or more offenses described in division (CC)(1) of section 2929.01 of the Revised Code, including all offenses described in that division of which the offender is convicted or to which the offender pleads guilty in the current prosecution and all offenses described in that division of which the offender previously has been convicted or to which the offender previously pleaded guilty, whether prosecuted together or separately.

(iii) The offense or offenses of which the offender currently is convicted or to which the offender currently pleads guilty is * * * any felony of the first degree that is an offense of violence and the court does not impose a sentence of life imprisonment without parole, or any felony of the second degree that is an offense of violence and the trier of fact finds that the offense involved an attempt to cause or a threat to cause serious physical harm to a person or resulted in serious physical harm to a person.

{¶ 39} In the instant case, Stokes argues that his convictions from 2008 for

aggravated burglary (deadly weapon), a felony of the first degree, and aggravated robbery (deadly weapon), a felony of the first degree, should not have been used as a basis for the application of the RVO specification because the convictions were "too old." Stokes provides no authority to support his assertion in this regard. Furthermore, none of the RVO statues, including R.C. 2941.149, R.C. 2929.01(CC), and R.C. 2929.14(B)(2)(b), specify any time limit that would disqualify prior offenses from consideration for an RVO specification. Accordingly, Stokes's argument in this regard has no merit.

{¶ 40} In light of the foregoing, we find that the trial court did not err when it overruled Stokes's Crim.R. 29 motion for acquittal since the State adduced sufficient evidence to support his convictions.

**Manifest Weight of the Evidence**

{¶ 41} Stokes also contends that his convictions were against the manifest weight of the evidence. Upon review of the record, we find no merit in Stokes's manifest-weight challenge. It is well-settled that evaluating witness credibility is primarily for the trier of fact. *State v. Benton*, 2d Dist. Miami No. 2010-CA-27, 2012-Ohio-4080, ¶ 7. Here the jury reasonably credited the testimony provided by the State's witnesses, applied that evidence and all reasonable inferences to the elements of the offense, and found Stokes guilty. Additionally, the jury was free to discredit Stokes's testimony that he was at his apartment at the times that the gas stations were robbed and that someone else who had borrowed his clothes must have committed the offenses. Having reviewed the entire record, we cannot find that the evidence weighed heavily against conviction or that a manifest miscarriage of justice occurred.

{¶ 42} Stokes's first, second, and third assignments of error are overruled.

{¶ 43} Stokes's fourth assignment of error is as follows:

THE STATE'S BRADY VIOLATION VIOLATED DEFENDANT-APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

{¶ 44} In his fourth assignment, Stokes contends that the State committed a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) when it improperly withheld the identity of Clarence Williams as one of the major contributors of DNA found on clothing taken from the scene of the Speedway robbery on October 2, 2019.

{¶ 45} As this Court has noted:

Pursuant to the United States Supreme Court's decision in *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215.

Therefore, in order to establish a due process violation under Brady, the defendant must demonstrate that: "(1) the prosecution failed to disclose evidence upon request; (2) the evidence was favorable to the defendant; and (3) the evidence was material." *State v. Goney*, 2d Dist. Greene No. 2017-CA-43, 2018-Ohio-2115, ¶ 66; *Moore v. Illinois*, 408 U.S. 786, 794-

795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

Because exculpatory and impeachment evidence are favorable to the defendant, both types of evidence may be the subject of a *Brady* violation, so long as the evidence is material. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "Evidence is considered material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *State v. Royster*, 2d Dist. Montgomery No. 26378, 2015-Ohio-625, ¶ 16, quoting *Bagley* at 682. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Bagley* at 682.

"As a rule, undisclosed evidence is not material simply because it may have helped the defendant to prepare for trial." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 49. "The United States Supreme Court has rejected a standard of materiality that focuses 'on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence.' " *Id.*, quoting *United States v. Agurs*, 427 U.S. 97, 112-113, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), fn. 20.

Furthermore, no *Brady* violation occurs when the undisclosed evidence is cumulative to evidence already known by the defense at the time of trial. *See State v. Cook*, 1st Dist. Hamilton No. C-950090, 1995 WL 763671, *3 (Dec. 29, 1995). There is also no *Brady* violation "if the

evidence that was allegedly withheld is merely cumulative to evidence presented at trial." (Citations omitted.) *State v. Bonilla*, 2d Dist. Greene No. 2008 CA 68, 2009-Ohio-4784, ¶ 26.

*State v. Smith*, 2d Dist. Montgomery No. 27853, 2018-Ohio-4691, ¶ 25-29.

{¶ 46} On the second day of trial, the following exchange occurred during a bench conference outside the hearing of the jury:

The State: This unknown male, [Detective] Jordan tells me that he does get a CODIS hit, and it's a guy that he knew from high school and so based on how he walks he knows that wasn't him.

Now, I never turned that over because [Detective] Jordan says – well, I just found that out – he said, well, I got that information and I knew it wasn't him. But I wanted to recall [Detective] Jordan to put that on.

Defense Counsel: I mean, he already rested.

Trial Court: So what you're saying is Detective Jordan is going to say the name came back and identified information of somebody that he knew?

The State: Personally knew, correct.

Trial Court: In looking at the surveillance video?

The State: He says he walks pigeon-toed, and that there was no way that was him because he knows how he walks.

Trial Court: He knew him in high school?

The State: Played football together.

Trial Court: Maybe there's a medical procedure that can correct that. But okay, yeah, if you want to call him, * * *.

Tr. 267-268.

{¶ 47} Thereafter, the State recalled Detective Jordan to testify regarding the identity of Clarence Williams:

The State: Detective, I put you back up because there's been some testimony from Nicole Hall about an unknown male, the major contributor on the interior right cuff of the sweatshirt. Are you familiar with that report?

Jordan: Yes, sir. I am.

Q: And you talked about how they would send it off to CODIS to see if they could get a hit on that individual. Are you familiar with that process?

A: Yes, sir.

Q: And in this case in item number 19-11921, were you actually sent a notice of a possible hit through CODIS?

A: I was.

Q: And can you just tell the jury when you got that, what you did with that information and what you were able to figure out, one, or discover from that unknown individual?

A: I don't recall the exact date I received it, but I received it sometime after the evidence was submitted from BCI. When I got it, I recognized the name right away. This individual, Mr. Clarence Williams, and I played high school football together four years at Springfield South.

I know him quite well and when I looked at the video surveillance, I knew in fact that that wasn't Mr. Williams.

I actually took the time though to find Mr. Williams and spoke to him

about this, and he assured me that he had nothing to do with that. I told him that I just needed to ask him about it and clear that up because I thought it would come up at some point.

Q: All right. And just based on your knowledge of him since high school, did the person in the video, how [sic] his walk was or how he held himself, in your opinion based on what you know personally, that was not that individual?

A: No. Clarence actually walks pigeon-toed. After reviewing the video, I saw that the suspect in the case [Stokes] did not walk pigeon-toed so I knew it wasn't Clarence.

Tr. 269-271. Significantly, Stokes did not object to the State's request to recall Detective Jordan, nor did Stokes object to any of the detective's testimony in regards to Williams and his belief that Williams had not been the perpetrator of the robberies based upon Williams's allegedly being pigeon-toed.

{¶ 48} Thereafter, Stokes testified on his behalf as the only witness for the defense. In regards to Williams, Stokes testified that they were friends and that Stokes regularly loaned him clothes. Stokes testified that he also loaned clothes to other individuals. Stokes testified that after being charged with the instant offenses, he contacted Detective Jordan and asked to meet with him to discuss the case. Stokes, however, did not inform Detective Jordan at that time that he was in the habit of loaning clothes to his friends.

{¶ 49} Notably, in his closing argument, defense counsel stated that the evidence taken from the discarded clothes at the crime scenes established that there were multiple

contributors of DNA, including Williams. During closing arguments, defense counsel also discussed Williams and his relationship with Detective Jordan, stating "the only reason he was let off the hook is because one of the detectives knew him personally and knew he was pigeon-toed. Now if he hadn't had the benefit of that unusual knowledge and insight because he went to high school and played high school football with the guy, where would that have left Clarence Williams?" Tr. 318-319.

{¶ 50} In our view, even with the late identification of Williams as a major contributor of DNA, Stokes was able to take advantage of the evidence during trial. Defense counsel was able to cross-examine Detective Jordan regarding his relationship with Williams. Defense counsel was also able to question Stokes himself with respect to his friendship with Williams and his practice of allowing his friends to borrow clothes. Simply put, we find that there is no reasonable probability that, had the evidence been disclosed to the defense prior to trial, the result of the proceeding would have been different.

{¶ 51} Stokes's fourth assignment of error is overruled.

{¶ 52} Stokes's fifth and final assignment of error is as follows:

DEFENDANT-APPELLANT'S SENTENCE IS CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

{¶ 53} Stokes argues that the trial court's imposition of a sentence of 40 years to 45 and one-half years in prison amounted to a life sentence and therefore constituted

cruel and unusual punishment. Specifically, Stokes argues that the trial court imposed a lengthy sentence out of vindictiveness because he chose to go to trial.

{¶ 54} Stokes does not dispute that each of his individual sentences was authorized by statute. Stokes also does not challenge the constitutionality of the sentencing statute or contend that any of his individual sentences was grossly disproportionate to the specific offenses for which the sentence was imposed. Rather, Stokes's argument regards his sentence as a whole, as a package. *See State v. Brady*, 2d Dist. Montgomery No. 27763, 2019-Ohio-46, ¶ 43.

{¶ 55} "The trial court has full discretion to impose any sentence within the authorized statutory range[.]" *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). In exercising its discretion, a trial court must consider the statutory policies that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12. *State v. Leopard*, 194 Ohio App.3d 500, 2011-Ohio-3864, 957 N.E.2d 55, ¶ 11 (2d Dist.), citing *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38. However, the trial court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences. *King* at ¶ 45.

{¶ 56} The Ohio Supreme Court recently stated that R.C. 2953.08(G)(2)(b) "does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12." *State v. Jones*, 163 Ohio St.3d 242, 169 N.E.3d 649, 2020-Ohio-6729, ¶ 39. When reviewing felony sentences that are imposed solely after considering the factors in R.C. 2929.11 and R.C. 2929.12, we do not analyze whether those sentences are unsupported by the record. *State v. Dorsey*, 2d Dist. Montgomery No. 28747, 2021-Ohio-76, ¶ 18;

*Jones* at ¶ 26-29. Instead, "[w]e simply must determine whether those sentences are contrary to law." *Dorsey* at ¶ 18. "A sentence is contrary to law when it does not fall within the statutory range for the offense or if the trial court fails to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors set forth in R.C. 2929.12." (Citation omitted.) *State v. Brown*, 2017-Ohio-8416, 99 N.E.3d 1135, ¶ 74 (2d Dist.).

**{¶ 57}** "The Eighth Amendment to the United States Constitution states, 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' A key component of the Constitution's prohibition against cruel and unusual punishment is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910). 'Protection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment.' *Montgomery v. Louisiana*, 577 U.S. 190, 205, 136 S.Ct. 718, 732-733, 193 L.Ed.2d 599 (2016)." *State v. Moore*, 149 Ohio St.3d 557, 2016-Ohio-8288, 76 N.E.3d 1127, ¶ 31.

**{¶ 58}** "It is generally accepted that punishments which are prohibited by the Eighth Amendment are limited to torture or other barbarous punishments, degrading punishments unknown at common law, and punishments which are so disproportionate to the offense as to shock the moral sense of the community." *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69, 203 N.E.2d 334 (1964). "There are two classifications of proportionality review – one involving the length of term-of-years sentences given in a particular case and the other involving categorical restrictions." *Moore* at ¶ 32.

**{¶ 59}** A proportionality review based on categorical restrictions involves " 'cases

in which the Court implements the proportionality standard by certain categorical restrictions.' " *In re C.P.*, 131 Ohio St.3d 513, 2012-Ohio-1446, 967 N.E.2d 729, ¶ 26, quoting *Graham v. Florida*, 560 U.S. 48, 59, 130 S.Ct. 2011, 176 L.Ed.2d 825. "Within that classification, there are two subsets, 'one considering the nature of the offense, the other considering the characteristics of the offender.' " *Id.* at ¶ 27, quoting *Graham* at 60, 130 S.Ct. 2011. "The court engages in a two-step process in adopting categorical rules in regard to punishment: first, the court considers whether there is a national consensus against the sentencing practice at issue, and second, the court determines 'in the exercise of its own independent judgment whether the punishment in question violates the Constitution.' " *Id.* at ¶ 29, quoting *Graham* at 61.

{¶ 60} In *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, the Supreme Court of Ohio held proportionality review of sentences should focus on individual sentences rather than on the cumulative impact of multiple sentences imposed consecutively. *Id.* at ¶ 20. The sole issue before the court in *Hairston* concerned whether the aggregate, 134-year prison term imposed on Hairston constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Section 9, Article I of the Ohio Constitution. *Id.* at ¶ 1. Because this aggregate term of incarceration resulted from Hairston's guilty pleas to four counts of aggravated robbery, four counts of kidnapping, three counts of aggravated burglary, all with firearm specifications, and three counts of having a weapon while under disability, and because none of his individual sentences were grossly disproportionate to their respective offenses, the Supreme Court concluded that his aggregate sentence was not unconstitutional. *Id.* at ¶ 22-23. Given that the trial court is not obligated to refer to every

factor listed in R.C. 2929.12 as part of its sentencing analysis, "the defendant has the burden to affirmatively show that the court did not consider the applicable sentencing criteria or that the sentence imposed is 'strikingly inconsistent' with the applicable sentencing factors." *State v. Hull*, 2017-Ohio-157, 77 N.E.3d 484, ¶ 8 (11th Dist.). "Where none of the individual sentences imposed on an offender are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment." *Hairston* at syllabus.

{¶ 61} In the instant case, Stokes was convicted of three robberies, and he committed two of the offenses using a firearm. Significantly, during the robbery on September 22, 2019, Stokes punched Bowman, the cashier, in the nose, thereby injuring him. Additionally, the record establishes that Stokes had a history of violent crime. Given that each of Stokes's individual prison sentences was within the authorized statutory range, we conclude that the total sentence did not constitute cruel and unusual punishment. *Brady,* 2d Dist. Montgomery No. 27763, 2019-Ohio-46, at ¶ 45.

{¶ 62} Stokes's fifth assignment of error is overruled.

{¶ 63} All of Stokes's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies sent to:

Ian A. Richardson
Steven H. Eckstein
Hon. Douglas M. Rastatter