[Cite as *State v. Kent*, 2022-Ohio-834.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 109118 |
| v. | : | |
| WAYMAN D. KENT, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 17, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-638811-A

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Megan Helton, and Daniel T. Van, Assistant Prosecuting Attorneys, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Francis Cavallo, Assistant Public Defender, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Wayman D. Kent ("Kent"), appeals from his convictions and sentence following a jury trial. He raises the following assignments of error for review:

1. The trial court erred in denying Kent's motion to suppress.

2. There was insufficient evidence produced at trial to support a finding of guilt on all counts.

3. The jury verdict was against the manifest weight of the evidence.

4. Kent was denied the effective assistance of counsel in his trial.

5. Kent's indefinite sentence under S.B. 201 was unconstitutional and deprived him of fundamental due process protections.

6. Kent received ineffective assistance of counsel when his attorney failed to object to the imposition of an unconstitutional prison sentence under the Reagan Tokes Act.

{¶ 2} After careful review of the record and relevant case law, we affirm Kent's conviction and sentence.

## I. Procedural and Factual History

{¶ 3} In April 2019, Kent was named in a criminal indictment, charging him with three counts of drug trafficking in violation of R.C. 2925.03(A)(2), with forfeiture specifications; five counts of drug possession in violation of R.C. 2925.11(A), with forfeiture specifications; and one count of possessing criminal tools in violation of R.C. 2923.24(A), with forfeiture specifications. The indictment stemmed from the discovery of certain controlled substances on Kent's person during a traffic stop. At the time of the traffic stop, Kent was in the passenger's seat of a vehicle driven by his codefendant, Michael Marneros ("Marneros").

{¶ 4} In July 2019, Kent filed a motion to suppress "all evidence obtained from the illegal stop and subsequent warrantless search and seizure, as well as statements taken from [him] in violation of his *Miranda* rights." Kent argued that

(1) there was no lawful cause to stop the vehicle in which he was a passenger, (2) there was no legal basis to physically search his person following the initial traffic stop, (3) the search of his person unlawfully exceeded the scope of a limited pat down for officer safety, and (4) law enforcement conducted an interrogation without adhering to his *Miranda* rights.

{¶ 5} A suppression hearing was held in August 2019. On behalf of the state, Sergeant Jarrod Durichko ("Sgt. Durichko") of the Cleveland Police Department testified that on April 4, 2019, he and members of the vice unit were surveilling a high-crime area that is "known for drug sales and drug activity." (Tr. 17.) During his patrol, Sgt. Durichko observed a white vehicle pull into the parking lot of a nearby gas station. While the vehicle was parked at the gas station, Sgt. Durichko witnessed "three completely separate individuals approached the driver's side of the vehicle, reached into the driver's window for a brief exchange, and then parted ways." (Tr. 17.) Sgt. Durichko testified that when the white vehicle left the gas station, it turned eastbound on Harvard Avenue without using a turn signal. Based on his good -faith belief that a traffic infraction had occurred, Sgt. Durichko notified other units in the area to "approach and conduct a traffic stop of the vehicle." (Tr. 18.) Sgt. Durichko did not participate in the subsequent traffic stop of the white vehicle.

{¶ 6} Detective Daniel Hourihan ("Det. Hourihan") of the Cleveland Police Department testified that on April 4, 2019, he received a radio dispatch from Sgt. Durichko instructing him to initiate a traffic stop of the white vehicle seen leaving

the gas station. Det. Hourihan confirmed that he initiated the traffic stop because the vehicle pulled out of the gas station without using its turn signal. Det. Hourihan testified that when he requested identification from the driver of the vehicle, the driver informed him that he did not have a valid driver's license. Once Det. Hourihan confirmed that the driver of the vehicle, later identified as Marneros, had a suspended driver's license, he performed a pat-down search of the driver and advised him that he was under arrest.

{¶ 7} While Det. Hourihan was speaking with Marneros, Detective Matthew Pollack ("Det. Pollack") was dealing with the vehicle's passenger, who was later identified as Kent. Det. Hourihan stated that he observed Det. Pollack perform a pat-down search of Kent for officer safety. Det. Pollack then advised Det. Hourihan that he "had found something" on Kent and "needed gloves." (Tr. 39.) When a large quantity of drugs were recovered from Kent's underwear, Det. Hourihan read Kent his *Miranda* rights. Notwithstanding Det. Hourihan's advisement, Kent continued to speak with the detectives and admitted that there was "cocaine, percocet, and heroin in [the] bags of drugs" discovered by the detectives. (Tr. 43.)

{¶ 8} Det. Pollack confirmed that he participated in the traffic stop of the white vehicle and the subsequent search of Kent's person on April 4, 2019. Det. Pollack stated that while he was performing a pat-down search of Kent for officer safety, he "felt something that had the consistency of contraband" hidden in Kent's groin area. (Tr. 64.) Det. Pollack explained that the contraband was located in an area that was inconsistent with a person's "anatomy." (Tr. 65.) Based on his training

and experience, Det. Pollack expressed that he "knew what [he] felt," and "had no doubt in [his] mind" that Kent was in possession of contraband. (Tr. 64, 68.) Accordingly, Det. Pollack handcuffed Kent before he pulled back Kent's pants and recovered a large plastic baggie containing contraband from inside Kent's underwear.

{¶ 9} At the conclusion of the hearing, the trial court denied Kent's motion to suppress, stating, in relevant part:

> All right. The motion to suppress is denied. Our Eighth District court has in numerous cases indicated that when it is a lawful *Terry* pat-down, which this was, and the nature is apparent to the officer to be contraband — and in fact in *State v. Hunter*, at 98 Ohio App.3d 632, the Eighth District held that the incriminating nature of the wadded-up plastic bag was immediately apparent to the officer. And that's exactly what the officer testified to here. And so it is denied, the motion to suppress.

(Tr. 85.)

{¶ 10} Following unsuccessful plea negotiations, the matter proceeded to a joint jury trial against Kent and Marneros. At trial, Sgt. Durichko reiterated much of his testimony from the suppression hearing. On April 4, 2019, Sgt. Durichko was surveilling a high-crime area known for drug activity when he observed a white vehicle pull into a nearby gas station. Sgt. Durchiko testified that the white vehicle parked next to a gas pump for approximately 10 to 15 minutes. During this duration of time, Sgt. Durichko witnessed three separate males walk to the car, lean into the driver's side door, and stay for less than a minute before walking away. (Tr. 405.) Sgt. Durichko explained that each encounter was "done with a level of secrecy" that

raised suspicions. (Tr. 406-407.) When the white vehicle eventually left the gas station, it turned left onto a roadway without using its turn signal. (Tr. 408.) Sgt. Durichko immediately contacted Det. Hourihan via radio and instructed him to initiate a traffic stop of the white vehicle. (Tr. 458-459.) Sgt. Durichko did not participate in the traffic stop or the subsequent interaction with Kent.

{¶ 11} Consistent with his testimony during the suppression hearing, Det. Hourihan testified that he conducted a traffic stop of the white vehicle pursuant to the directives of Sgt. Durichko. During the traffic stop, Det. Hourihan learned that the driver of the white vehicle, codefendant Marneros, had a suspended driver's license. (Tr. 460; 464.) Marneros was removed from the vehicle and a pat down was conducted. (Tr. 465.) Det. Hourihan located a small bag of marijuana on Marneros's person. (Tr. 465.) Marneros was placed in handcuffs and detained. (Tr. 467.) While detained, Marneros notified Det. Hourihan that there was a firearm inside the vehicle. (Tr. 467). A loaded firearm was later discovered in between the driver's seat and center console of the vehicle. (Tr. 529.)

{¶ 12} While Det. Hourihan was conferring with Marneros, Det. Pollack made contact with the front-seat passenger, who was later identified as Kent. Video footage of Det. Pollack's interaction with Kent was recorded by his body camera. The video footage was played for the jury as Det. Pollack described the events as they occurred.

{¶ 13} Following a brief conversation, Det. Pollack asked Kent to step out of the vehicle so that he could perform a pat-down search for officer safety. During the

pat-down search, Det. Pollack felt what was immediately apparent to him as contraband. While Det. Pollack waited for gloves to retrieve the contraband, he observed Kent "digging in his underwear, even though he was handcuffed, in an effort to either further conceal the drugs or destroy them." (Tr. 534.) Det. Pollack then removed a large plastic baggie from Kent's underwear. Separate, individual plastic baggies containing various drugs were discovered within the larger plastic baggie removed from Kent's person.

{¶ 14} Det. Pollack testified that he secured the recovered contraband while Det. Hourihan read Kent his *Miranda* rights. Thereafter, Kent expressed to Det. Hourihan that the drugs recovered from him had "a couple of grams of crack," "seven percocet," "less than ten grams of heroin," and "fentanyl." (Tr. 471.) Upon further search of the vehicle, Det. Pollack located a loaded firearm and two cell phones. (Tr. 527-529.) Additionally, $1,008.00 was found in Kent's pocket. (Tr. 527.) Kent and Marneros were both arrested and transported to jail.

{¶ 15} Leslie Lemmerbrock ("Lemmerbrock"), a forensic chemist for the Cuyahoga County Medical Examiner's Office, testified that she analyzed the drugs seized in this case and completed a physical evidence examination report. With respect to the drugs recovered from Kent, Lemmerbrock stated that she tested various substances that were found inside five separate plastic baggies that were within one larger plastic baggie. Lemmerbrock testified that the plastic baggies contained the following (1) seven-unit doses of oxycodone and acetaminophen; (2) 1.21 grams of cocaine; (3) 0.64 grams of a tan powder consisting of heroin, fentanyl,

cocaine, and tramadol; (4) 1.56 grams of cocaine; and (5) 10.04 grams of yellow fragments consisting of heroin, fentanyl, and cocaine.

{¶ 16} On behalf of the defense, John Rogers ("Rogers") testified that he had employed Kent at his car dealership on and off for the last 10 years. Rogers testified that Kent earned up to $125 a day and was paid in cash on a weekly basis.

{¶ 17} At the conclusion of trial, Kent was found guilty of all counts and accompanying specifications. He was sentenced to "an indefinite prison term of a minimum of six years and a maximum of nine years."

{¶ 18} Kent now appeals from his convictions and sentence.

## II. Law and Analysis

### A. Motion to Suppress

{¶ 19} In his first assignment of error, Kent argues the trial court erred in denying his motion to suppress.

{¶ 20} A motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When considering a motion to suppress, the trial court assumes the role of trier of fact and is, therefore, in the best position to resolve factual questions and evaluate the credibility of witnesses. *Id.* Consequently, an appellate court must defer to the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* An appellate court, however, must independently determine as a matter of law, without deference to the trial court's conclusion, whether the facts meet the applicable

standard. *State v. Hill*, 8th Dist. Cuyahoga Nos. 83762 and 83775, 2005-Ohio-3155, ¶ 12.

**{¶ 21}** The Fourth Amendment to the United States Constitution and Article I, Section 14, of the Ohio State Constitution protect against unreasonable governmental searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Warrantless searches and seizures are considered per se unreasonable, unless an exception to the warrant requirement applies. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**{¶ 22}** It is well established that "'[a] police officer may [initiate] a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct.'" *State v. Hrtsyak*, 8th Dist. Cuyahoga No. 108506, 2020-Ohio-920, ¶ 21, quoting *State v. Bennett*, 8th Dist. Cuyahoga No. 86962, 2006-Ohio-4274, ¶ 21, citing *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995). "'Trial courts determine whether any violation occurred, not the extent of the violation.'" *Cleveland v. Martin*, 2018-Ohio-740, 107 N.E.3d 809 (8th Dist.), quoting *State v. Hodge*, 147 Ohio App. 3d 550, 2002-Ohio-3053, 771 N.E.2d 331, ¶ 27 (7th Dist.).

**{¶ 23}** To conduct a constitutionally valid investigatory stop under *Terry*, a police officer must be able to point to specific and articulable facts that, taken together with rational inferences derived from those facts, give rise to a reasonable suspicion that the individual has committed, is committing, or is about to commit a crime. *State v. Williams*, 51 Ohio St.3d 58, 60, 554 N.E.2d 108 (1990). The

propriety of an investigative stop by a police officer must be viewed in light of the totality of the circumstances. *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), paragraph one of the syllabus.

{¶ 24} Courts have routinely recognized that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). "To justify a pat down of the driver or a passenger during a traffic stop, * * * just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). "'The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue [the officer's] investigation without fear of violence * * *.'" *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), quoting *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

{¶ 25} On appeal, Kent does not challenge the validity of the initial traffic stop of Marneros's vehicle or Det. Pollack's decision to pat him down for officer safety. Kent argues, however, that Det. Pollack exceeded the permissible scope of a pat-down search and had no lawful basis to perform "a deeply intrusive physical search of [his] person, using rubber gloves." He further contends the officers unlawfully elicited incriminating statements from him that "were produced as a

direct result of the earlier illegal search and were therefore the 'fruit of the poisonous tree.'"  We address each of these arguments separately.

### 1.  Scope of Search of Kent's Person

{¶ 26} "Although *Terry* limits the scope of [a pat-down] search to weapons, the discovery of other contraband during a *Terry* search will not necessarily preclude its admissibility."  *State v. Hansard*, 4th Dist. Scioto No. 07CA3177, 2008-Ohio-3349, ¶ 30.  Relevant to this case, the United States Supreme Court adopted the plain-feel doctrine in *Minnesota v. Dickerson*, where the court held,

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Id.,* 508 U.S. 366, at 375-376, 113 S.Ct. 2130, 124 L.Ed.2d 334.  "If the illegal nature of the suspicious object is not immediately apparent, police are not permitted to continue touching, feeling, or manipulating the object to identify its nature."  *Id.*

{¶ 27} "'Immediately apparent' means that the officer must have had probable cause to believe the item was contraband."  *State v. Hall*, 8th Dist. Cuyahoga No. 97722, 2012-Ohio-4155, ¶ 11, quoting *State v. Seibert*, 5th Dist. Tuscarawas No. 2003CR-08 0197, 2005-Ohio-275, ¶ 17, citing *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).  "'Probable cause to associate an object with criminal activity does not demand certainty in the minds of police, but instead merely requires that there be a fair probability that the object they see [or feel] is illegal contraband or evidence of a crime.'"  *Id.*, quoting *State v.*

*Jones*, 2d Dist. No. Montgomery No. 19248, 2002-Ohio-4681, ¶ 10, citing *State v. Thompson*, 134 Ohio App.3d 1, 4, 729 N.E.2d 1268 (2d Dist.1999).

{¶ 28} In this case, Kent asserts that the plain-feel doctrine is inapplicable because Det. Pollack "could not identify the character of the object with any particularity, asserting that it was some variety of contraband without any specificity." Kent contends that Det. Pollack's conduct was prompted by a mere hunch and that his "bare bones identification" was insufficient to warrant a finding of probable cause.

{¶ 29} After careful consideration, we find the factual circumstances presented here are analogous to cases where Ohio courts have upheld the application of plain-feel doctrine. For instance, in *State v. Hoskins*, 8th Dist. Cuyahoga No. 80384, 2002-Ohio-3451, officers initiated a traffic stop of a vehicle that was observed driving with its passenger door wide open. During the traffic stop, an officer conducted a pat down of the defendant for officer safety. The officer testified that while performing the pat down he felt an object that he immediately identified as crack cocaine in the area of the defendant's right thigh. This court upheld the seizure of the illegal drugs, stating:

> Here, the record clearly establishes that Officer Martin, during the course of the lawful *Terry* search, discovered what he immediately determined to be crack cocaine. Because the contraband was in "plain feel," Officer Martin did not violate [the defendant's] constitutional right to be free from unreasonable searches.

*Id.* at ¶ 19-20.

{¶ 30} Similarly, in *State v. Brown*, 4th Dist. Ross No. 18CA3644, 2019-Ohio-1112, a police officer stopped a vehicle, recognized the defendant as a person involved in drug activity, and observed a K-9's positive alert for drugs in the vehicle. The officer also noticed the defendant's nervous manner and asked him to exit the vehicle for a weapons pat down. During the pat down, the officer felt an "abnormality — a large bulge between Brown's legs — that, through his drug-interdiction experience, he immediately knew was contraband, although he did not know the particular type of contraband." *Id.* at ¶ 7. The Fourth District recognized that although an officer cannot squeeze or manipulate an object to determine whether it is contraband during a weapons pat-down search, the officer was entitled to seize an object once the officer felt and immediately recognized the contraband. *Id.* at ¶ 23; citing *State v. Milhouse*, 133 Ohio App.3d 527, 530, 728 N.E.2d 1123 (1st Dist.1999) ("If, during the course of a *Terry* pat-down search of a subject's clothing for weapons, 'a police officer feels an object whose contour or mass makes its incriminating character as contraband immediately apparent, and the officer has a lawful right of access to the object, the officer is entitled to seize the object' under the plain-feel doctrine").

{¶ 31} As in *Hoskins* and *Brown*, the evidence presented at trial refutes Kent's position that Det. Pollack acted on a mere hunch. At the suppression hearing, Det. Pollack testified that while performing a pat-down search of Kent for officer safety, he "felt something that had the consistency of contraband in [Kent's groin area]." (Tr. 63-64.) Based on the location of the "golf-ball sized" bulge, and his

training and experience in the vice unit, Det. Pollack testified that it was immediately apparent to him that the bulge had the consistency of "illegal narcotics." (Tr. 61, 70.) Det. Pollack's testimony and the immediacy of his conclusions were corroborated by the video footage captured by his body camera.

{¶ 32} Under these circumstances, we find Det. Pollack did not exceed the scope of a permissible *Terry* search during the pat down of Kent for officer safety and that the seizure of contraband was warranted under *Dickerson*. Contrary to Kent's position on appeal, investigating officers are not required to accurately predict the specific chemical-makeup of the discovered contraband, such as whether the bulge contained "crack as opposed to heroin," for the plain-feel doctrine to be applicable. And while Kent may attack the credibility of the detective, "whether the nature of the items is 'immediately apparent' is a question of fact for the trial court, which is in a much better position than this court to gauge police credibility." *Hansard*, 4th Dist. Scioto No. 07CA3177, 2008-Ohio-3349, at ¶ 31-32. Because competent, credible evidence supports the trial court's findings and application of the plain-feel exception to the warrant requirement, the seizure of the illegal narcotics located on Kent's person did not violate his Fourth Amendment rights.

## 2. Custodial Interrogation

{¶ 33} Kent further argues the trial court erred by failing to suppress incriminating statements that were made during a custodial interrogation. Without citation to the record, Kent contends that the state impermissibly introduced

evidence of the statements he made to the arresting officers before he was advised of his *Miranda* rights.

{¶ 34} In this case, the record reflects that when Det. Pollack felt the bulge in Kent's groin area, he asked Kent what the object was, and Kent responded that the bulge was a part of his anatomy. Because the criminal nature of the contraband was immediately apparent to Det. Pollack, Kent was placed in handcuffs while Det. Pollack obtained rubber gloves to remove the contraband from Kent's groin area. During this time period, Kent continued to reiterate that the bulge was a part of his anatomy. Subsequently, the contraband was removed from Kent's person and Kent was read his *Miranda* rights by Det. Hourihan. Thereafter, Kent continued to speak with the detectives and conceded that plastic baggies contained cocaine, percocet, and heroin. (Tr. 43.)

{¶ 35} In *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1996), the United States Supreme Court established procedural safeguards for securing the privilege against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution. The Fourteenth Amendment to the United States Constitution makes the privilege against self-incrimination applicable to a witness in a state proceeding. *Malloy v. Hogan*, 378 U.S. 1, 3, 84 S.Ct 1489, 12 L.Ed.2d 653 (1964). A similar privilege is recognized in Article I, Section 10, of the Ohio Constitution.

{¶ 36} What are now commonly known as *Miranda* warnings are intended to protect a suspect from the coercive pressure present during a custodial

interrogation. *Miranda* at 469. "The duty to advise a suspect of *Miranda* rights does not attach until questioning rises to the level of a 'custodial interrogation.'" *State v. Gumm,* 73 Ohio St.3d 413, 429, 653 N.E.2d 253 (1995), citing *State v. Roe*, 41 Ohio St.3d 18, 21, 535 N.E.2d 1351 (1989). In judging whether an individual has been placed into custody the test is whether, under the totality of the circumstances, a "reasonable person would have believed that he was not free to leave." *Gumm,* quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). *Accord Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). In resolving the issue of custody, courts consider certain factors relevant to this determination: (1) the location of the questioning, (2) the duration of the questioning, (3) statements made during the interview, (4) the presence or absence of physical restraints, and (5) whether the individual was released at the end of the interview. *In re M.H.*, 8th Dist. Cuyahoga No. 105742, 2018-Ohio-4848, ¶ 25, citing *Howes v. Fields*, 565 U.S. 499, 132 S.Ct. 1189, 182 L.Ed.2d 17 (2012); *In re J.S.*, 3d Dist. Marion No. 9-15-26, 2016-Ohio-255, ¶ 13.

{¶ 37} Additionally, "the special procedural safeguards outlined in *Miranda*, are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). "Interrogation is a measure of compulsion over and beyond that which is inherent in custody itself." *State v. Clark*, 7th Dist. Mahoning No. 08 MA 15, 2009-Ohio-3328, ¶ 27, citing *Innis* at 300. The *Innis* Court clarifies interrogation as follows:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

*Innis* at 300-301.

{¶ 38} On appeal, Kent initially contends that Det. Pollack impermissibly interrogated him while conducting the pat-down search of his person. However, it is well settled that "persons temporarily detained pursuant" to *Terry* stops "are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *State v. Brady*, 2d Dist. Montgomery No. 27763, 2019-Ohio-46, ¶ 22. Indeed, a police officer may restrain an individual's movement with handcuffs even during a *Terry* stop if the facts warrant it. *In re E.H.*, 8th Dist. Cuyahoga No. 107614, 2019-Ohio-2572, ¶ 35.

{¶ 39} Under the circumstances presented in this case, we find Kent was not in custody for the purposes of *Miranda* at the time Det. Pollack posed relevant questions regarding the items he felt while performing the pat down of Kent's person. As discussed, Det. Pollack's determination that Kent was in possession of illegal narcotics was not the product of Kent's statements during the *Terry* search. Rather, it was a product of Det. Pollack's experience and training in the vice unit and his determination that the criminal nature of the item felt in Kent's groin area was immediately apparent.

{¶ 40} Moreover, to the extent Kent challenges the questions posed to him while the detectives were retrieving rubber gloves to facilitate the removal of the contraband, we cannot identify any statement that Kent made to Det. Pollack that can be described as incriminating. During this relevant time period, Kent continued to refute Det. Pollack's assertion that the bulge was illegal narcotics and maintained that the object was a part of his physical anatomy. Thus, even if Kent's responses to Det. Pollack's questions while he was handcuffed were obtained in violation of *Miranda* and should have been suppressed, we cannot say that the trial court's failure to suppress these statements prejudiced Kent or would have changed the outcome of the proceedings. *See State v. Miller*, 8th Dist. Cuyahoga No. 106946, 2018-Ohio-4898, ¶ 37, citing *State v. Durham*, 2016-Ohio-691, 60 N.E.3d 552, ¶ 172-173 (8th Dist.) (even if a *Miranda* violation occurred, any error was harmless because the record contained overwhelming evidence of the defendant's guilt).

{¶ 41} Kent further contends that the detectives continued their interrogation without providing *Miranda* warnings once the drugs were removed from his groin area. Kent's interpretation of the facts, however, is not supported by the record. The testimony and video footage presented at the suppression hearing demonstrates that Kent was immediately read his *Miranda* rights once the contraband was removed from his person. Kent stated that he understood his *Miranda* rights, but voluntarily continued to speak with the detectives about the specific nature of the drugs. Although Kent maintained that the drugs were for his personal use, he identified the type of drugs that were inside the plastic baggies and

estimated that he possessed several grams of crack, seven Percocet, less than ten grams of heroin, and yellow-colored fentanyl.

{¶ 42} Alternatively, Kent argues the *Miranda* warnings provided to Kent did not "attenuate the taint of the unconstitutional arrest," where his statements were the product of an illegal search. Essentially, Kent contends that the fruit of the poisonous tree doctrine requires the exclusion of any evidence that was directly or indirectly derived from the unconstitutional seizure. Kent correctly states that evidence obtained in violation of the Fourth Amendment, as well as any evidence seized subsequent to such violation, must be suppressed as 'fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In this case, however, Kent does not challenge the validity of the initial traffic stop and, as discussed, the subsequent search and seizure was warranted under *Terry* and the plain-feel doctrine. Accordingly, Kent's reliance on the fruit of the poisonous tree doctrine is without merit.

{¶ 43} Based on the foregoing, we conclude the trial court did not err by denying Kent's motion to suppress. The first assignment of error is overruled.

## B. Sufficiency of the Evidence

{¶ 44} In his second assignment of error, Kent argues his convictions for drug trafficking and possession of criminal tools are not supported by sufficient evidence. Kent contends the "state's own witnesses failed to establish even the fundamental elements of the crimes charged."

{¶ 45} When assessing a challenge to the sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* Circumstantial and direct evidence "possess the same probative value." *Id.* at 272. A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 46} Kent was convicted of drug trafficking in violation of R.C. 2925.03(A)(2), which provides that no person "shall knowingly * * * [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance * * * when the offender knows or has reasonable cause to believe that the controlled substance * * * is intended for sale or resale by the offender or another person."

{¶ 47} R.C. 2901.22(B) provides that "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." Further, "[a] person has

knowledge of circumstances when the person is aware that such circumstances probably exist." *Id.*

{¶ 48} On appeal, Kent argues the evidence supporting his drug trafficking convictions was wholly insufficient and failed to establish his involvement in the sale of drugs on April 4, 2019. He states that the observing officers did not witness a hand-to-hand transaction take place inside the white vehicle, "nor could they provide testimony to support violations based upon any one of the six enumerated sections of R.C. 2925.03(A)(2)."

{¶ 49} Circumstantial evidence has long been used to successfully support drug trafficking convictions. *State v. Delaney*, 2018-Ohio-727, 106 N.E.3d 920, ¶ 11 (9th Dist.). "[T]he convergence of illegal drugs, drug paraphernalia (including baggies), and large sums of cash permit a reasonable inference that a person was preparing drugs for shipment." *Id.*; *see also State v. Rutledge*, 6th Dist. Lucas No. L-12-1043, 2013-Ohio-1482, ¶ 15 (citing several cases and stating that "numerous courts have determined that items such as plastic baggies, digital scales, and large sums of money are often used in drug trafficking and may constitute circumstantial evidence * * *.").

{¶ 50} At trial, Det. Pollack provided extensive testimony regarding his training and experience as a member of the vice unit. Relevant to this case, Det. Pollack testified that there are differences between a person who merely possesses drugs and a person who is engaged in trafficking. He explained that a person who uses drugs usually carries just enough substance on their person for one or two uses,

such as "a quarter of a gram to a gram" of crack or heroin, or "one or two pills." (Tr. 512.) In contrast, a drug trafficker typically carries a large amount of cash and anywhere from 5 to 30 grams of drugs at a time. Det. Pollack further testified that while drug users typically possess small single-use packages, drug traffickers "typically carry large amounts [of drugs] in a sandwich baggy." (Tr. 513.). If the trafficker has more than one drug, "they'll carry three or four different sandwich baggies of additional drugs to satisfy their multitude of customers." (Tr. *id.*) Det. Pollack further testified that drug traffickers "typically have multiple cell phones — one personal phone and one drug phone." (Tr. 514.)

{¶ 51} In this case, Kent was observed in a high crime area known for drug activity. Members of the vice team testified that the individuals inside Marneros's white vehicle acted in a manner that raised their suspicions of criminal conduct. Although the detectives did not observe a hand-to-hand transaction, Kent was subsequently found in possession of a large quantity of drugs that exceeded an amount indicative of personal use. Collectively, the money and cell phones recovered from Kent, along with the manner in which the drugs had been separated and packaged, supported the inference that Kent knowingly transported the contraband with the intent to sell. Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of drug trafficking proven beyond a reasonable doubt. Accordingly, we find sufficient evidence supported Kent's drug trafficking convictions.

{¶ 52} Kent was also convicted of possession of criminal tools in violation of R.C. 2923.24(A), which provides that "[n]o person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally." The criminal tools relevant in this case are "money and/or cell phones."

{¶ 53} As recognized by this court, "[i]t has long been established that otherwise innocuous objects such as bags, money, or cell phones can be used as criminal tools in drug trafficking[.]" *State v. Hawthorne*, 8th Dist. Cuyahoga No. 102689, 2016-Ohio-203, ¶ 21, citing *State v. Bowling*, 8th Dist. Cuyahoga No. 93052, 2010-Ohio-3595, ¶ 60. In this case, Kent was found in possession of two cell phones and cash in the amount of $1008 at the time a large quantity of drugs was recovered from his groin area. At trial, Det. Pollack testified that in his experience, cell phones and cash are commonly used as tools of the drug trade. He explained that drug traffickers "typically carry large amounts of cash on them for the trade" and "typically have multiple cell phones." (Tr. 513-514.) Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of possession of criminal tools proven beyond a reasonable doubt. *See Hawthorne* at ¶ 22 (98 individual bags of crack cocaine together with a cell phone and cash of $292 in various denominations constituted sufficient evidence for a possession of criminal tools conviction); *State v. Alexander*, 8th Dist. Cuyahoga No. 90509, 2009-Ohio-597, ¶ 28 ($544 in small denominations found in conjunction with 2.25 grams of crack cocaine); *Bowling* at ¶ 62 (a cell phone and $250 found with five prepackaged bags of crack cocaine); *State v. Williams*, 8th

Dist. Cuyahoga Nos. 92009 and 92010, 2009-Ohio-5553, ¶ 75 (12 individual, prepackaged bags of marijuana and $340 in cash).

{¶ 54} Kent's second assignment of error is overruled.

## C. Manifest Weight of the Evidence

{¶ 55} In his third assignment of error, Kent argues his convictions are against the manifest weight of the evidence. Kent contends the state "resorted to peddling innuendo and conjecture" and failed to present witnesses who could "offer any facts to support their contention that [Kent] engaged in the trafficking of drugs on the night in question."

{¶ 56} While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion. *State v. Whitsett,* 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26. Unlike a claim that the evidence is insufficient to support a conviction, which raises a question of law, manifest-weight challenges raise factual issues. When a defendant argues his or her conviction is against the manifest weight of the evidence, the court,

> reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

*Thompkins,* 78 Ohio St.3d at 387, 390, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 57}** After careful review, we cannot say this is the exceptional case in which the jury clearly lost its way. As stated, members of the Cleveland vice unit testified that, based on their extensive training and experience, the quantity and nature of the contraband found on Kent's person was indicative of drug trafficking. The detectives described the significance of how the drugs were packaged and explained that large sums of money and multiple cell phones are tools of the drug trade. While Kent reiterates that there was no observed hand-to-hand transaction, there was credible circumstantial evidence for the jury to conclude that the drugs discovered in Kent's possession were intended for sale and were not for Kent's own personal use. Under these circumstances, we find Kent's convictions are not against the manifest weight of the evidence.

**{¶ 58}** Kent's third assignment of error is overruled.

### D. Ineffective Assistance of Counsel

**{¶ 59}** In his fourth assignment of error, Kent argues defense counsel rendered ineffective assistance of counsel by failing to file an adequate motion to suppress. Kent asserts that the combined effect of counsel's deficient performance "undermined the fairness of the proceedings" and "served to prejudice his defense beyond repair."

**{¶ 60}** In order to prevail on an ineffective assistance of counsel claim, an appellant must demonstrate that trial counsel's performance fell "below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989),

paragraph two of the syllabus, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There is a general presumption that trial counsel's conduct is within the broad range of professional assistance, and debatable trial tactics do not generally constitute deficient performance. *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). In order to show prejudice, the appellant must demonstrate a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Bradley* at paragraph three of the syllabus.

{¶ 61} Kent asserts trial counsel was ineffective because the motion to suppress failed to properly frame the legal grounds supporting the suppression of critical evidence and failed to effectively promote Kent's position before the trial court. Without addressing the adequateness of defense counsel's motion to suppress or his representation during the suppression hearing, we find Kent has failed to establish the requisite level of prejudice. As set forth above, the legal arguments supporting the suppression of the evidence in this case are meritless. Thus, even if this court were to assume the motion to suppress was insufficiently briefed or argued, we are unable to conclude by a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.

{¶ 62} Kent's fourth assignment of error is overruled.

### E. Constitutionality of Indefinite Prison Sentence

{¶ 63} In his fifth assignment of error, Kent argues Ohio Revised Code sentencing provisions as enacted by Am.Sub.S.B. No. 201, commonly known as the

Reagan Tokes Law, are unconstitutional. He claims that the Reagan Tokes Law violates (1) the constitutional right to a trial by jury, (2) the separation-of-powers doctrine, and (3) due process.

{¶ 64} The Reagan Tokes Law was enacted in 2018 and became effective on March 22, 2019. *See* R.C. 2901.011. Under the law, qualifying first-and second-degree felonies committed on or after March 22, 2019, are subject to the imposition of indefinite sentences. The law specifies that these terms will consist of a minimum term selected by the sentencing judge from a range of terms set forth in R.C. 2929.14(A) and a maximum term determined by formulas set forth in R.C. 2929.144.

{¶ 65} The law establishes a presumptive release date at the end of the minimum term. R.C. 2967.271(B). The Ohio Department of Rehabilitation and Correction ("ODRC") may rebut that presumption, however, and keep the offender in prison for an additional period not to exceed the maximum term imposed by the trial judge. R.C. 2967.271(C). In order to rebut the presumption, the ODRC must conduct a hearing and determine whether one or more of the following factors apply:

> (1)(a) During the offender's incarceration, the offender committed institutional rule infractions that involved compromising the security of a state correctional institution, compromising the safety of the staff of a state correctional institution or its inmates, or physical harm or the threat of physical harm to the staff of a state correctional institution or its inmates, or committed a violation of law that was not prosecuted, and the infractions or violations demonstrate that the offender has not been rehabilitated, [and]

> (b) The offender's behavior while incarcerated, including, but not limited to the infractions and violations specified in division (C)(1)(a)

of this section demonstrate that the offender continues to pose a threat to society.

(2) Regardless of the security level in which the offender is classified at the time of the hearing, the offender has been placed by the department in extended restrictive housing at any time within the year preceding the date of the hearing.

(3) At the time of the hearing, the offender is classified by the department as a security level three, four, or five, or at a higher security level.

R.C. 2967.271(C)(1), (2), and (3).

{¶ 66} In this case, Kent did not object to his sentence or raise a constitutional challenge to the Reagan Tokes Law during his sentencing hearing. "It is well established that 'the question of the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court.'" *State v. Alexander*, 12th Dist. Butler No. CA2019-12-204, 2020-Ohio-3838, ¶ 8, quoting *State v. Buttery*, 162 Ohio St.3d 10, 2020-Ohio-2998, 164 N.E.3d 294, ¶ 7.

{¶ 67} This court has declined to address constitutional challenges to the Reagan Tokes Law when the defendants failed to object to their sentences or otherwise raise the constitutionality of the act at their sentencing hearing. *See State v. Dames*, 8th Dist. Cuyahoga No. 109090, 2020-Ohio-4991, ¶ 12-19; *State v. Hollis*, 8th Dist. Cuyahoga No. 109092, 2020-Ohio-5258, ¶ 47-54; and *State v. Stone*, 8th Dist. Cuyahoga No. 109322, 2020-Ohio-5263, ¶ 6-10. Nevertheless, we note that in *State v. Delvallie*, 8th Dist. Cuyahoga No. 109315, 2022-Ohio-470, this court, sitting en banc, held that the Reagan Tokes Law is constitutional in that it does not violate

the separation-of-powers doctrine and does not violate either a defendant's right to a jury trial or due process of law. Accordingly, the constitutional challenges presented in this appeal are overruled.

{¶ 68} Kent's fifth assignment of error is overruled.

**F. Failure to Object to Application of the Reagan Tokes Law**

{¶ 69} In his sixth assignment of error, Kent argues defense counsel rendered ineffective assistance of counsel by failing to object to the imposition of an unconstitutional prison sentence under the Reagan Tokes Law.

{¶ 70} Consistent with the foregoing, we are unable to conclude that counsel rendered ineffective assistance of counsel. Because this court has determined that the Reagan Tokes Law is constitutional, an objection to the constitutionality of the Reagan Tokes Law would not have changed the outcome of the case. Thus, Kent cannot establish the requisite prejudice.

{¶ 71} Kent's sixth assignment of error is overruled.

{¶ 72} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, P.J., and
MARY EILEEN KILBANE, J., CONCUR


N.B. Judge Eileen T. Gallagher joined the dissent by Judge Lisa B. Forbes in *Delvallie* and would have found that R.C. 2967.271(C) and (D) of the Reagan Tokes Law are unconstitutional.

Judge Mary Eileen Kilbane joined the dissenting opinion by Judge Lisa B. Forbes and the concurring in part and dissenting in part opinion by Judge Anita Laster Mays in *Delvallie* and would have found the Reagan Tokes Law unconstitutional.